# EXHIBIT "C"

[Draft...Letterhead]

Dear Smith –

I hope all is well.

I have been asked by the board and independent shareholders of AmmoCore to assist them in re-starting the company, and in investigating the condition of the debtor and how AmmoCore got in that condition. In the course of conducting the investigation, a number of matters have come to light that on their face are unfavorable to Cadence. I'd like to ask you either to clarify those issues, or simply proceed on a negotiated basis that creates a better outcome for all parties concerned.

While undoubtedly there were business, technical, strategic and managerial problems with AmmoCore, there are also important questions raised about Cadence's conduct as a fiduciary, contractual business partner and a party subject to a consent decree intended to facilitate competition.

Overall, the facts support an initial conclusion that Cadence manipulated its dealings with AmmoCore to the disadvantage of AmmoCore and its common stockholders and to the advantage of Cadence's business, Cadence's individual executives, and Cadence's desire to avoid disclosing certain information to relevant government agencies. While Cadence was certainly free to pursue its own business interests, AmmoCore became "road kill" to Cadence's shifting strategies, personnel and motivations, during a time that Cadence had both fiduciary and contractual duties to AmmoCore, and a time when Cadence was subject to a consent decree that was intended to protect interoperability and competition in the routing market.

I want to share my preliminary conclusions with you and request a meeting with Cadence senior executives, as called for by Section 8.11 of the Asset Purchase Agreement between AmmoCore and Cadence (the "Asset Purchase Agreement"). If it appears you are conflicted, we could also notify your GNC (John Shoven) directly because of the governance issues involved. If you conclude that you are not conflicted, then obviously we would rather work with you directly. I am also listing a few questions below to help further our understanding; it is possible that the answers to these questions would reveal that our concerns are misplaced, so we look forward to learning more.

**Issues with regard to Cadence's conduct in relationship to AmmoCore**

<u>Self-dealing in the formation and implementation of the Asset Purchase Agreement.</u>
While "fire sale" transactions are never pretty, the terms of the Asset Purchase Agreement are atypically favorable to Cadence. Among the atypical aspects of this transaction:

    i. It appears that Cadence representatives or affiliates (i.e. Jim Hogan and Bruce Bourbon) effectively controlled AmmoCore's side of the negotiations. Gary Larsen, AmmoCore's then CEO, was excluded from negotiations, as was Tom

Ex 16

Katsioulas. It is not clear the degree to which AmmoCore's putative counsel, Warren Lazarow, was either engaged on AmmoCore's behalf or might have been conflicted through other dealings with Cadence.

ii. The Asset Purchase Agreement permitted (either through its terms or through the failure of the Cadence-affiliated representatives to protect the interests of AmmoCore in its enforcement) Cadence to hire away key engineers through the course of negotiating and then review source code without closing. Since it is universally understood in the EDA industry that access to source code and engineers constitutes effective control of intellectual property, AmmoCore clearly did not protect its interests in the transaction.

iii. Throughout the history of AmmoCore, Cadence representatives and affiliates shaped the business and technical strategy of AmmoCore to focus AmmoCore's interface and inter-operability on Cadence, despite AmmoCore's desire to link with routing tools such as Synopsys and Magma. As a result, AmmoCore's possible value to another EDA purchaser was diminished, and with it its negotiating leverage vis-à-vis this one-sided Cadence transaction.

iv. The Asset Purchase Agreement was precipitated by the Company's running out of cash and lack of alternatives for fund-raising or other buyers. However, the Company had closed on a first tranche of a bridge and had been assured by the investors (primarily Cadence and affiliates) that further funding was forthcoming. AmmoCore's CEO Gary Larsen would have pursued other funding alternatives had he known that he would be in such a dire situation as emerged.

v. Overall, it appears the Cadence as a creditor, shareholder, board member, and fiduciary did not seek to maximize the value of AmmoCore in the disposition of its assets.

## 2. Cadence's failure to follow through with the Asset Purchase Agreement.

Notwithstanding the highly favorable terms of the Asset Purchase Agreement, Cadence failed to follow through on its terms, and to our knowledge has not provided any communication to the company to justify such conduct. It appears that the most likely reasons for Cadence's actions were (a) that it had already effectively transferred the AmmoCore IP through the hiring of AmmoCore engineers and access to the source code, (b) that Cadence was seeking to avoid a transaction that would require notice to the FTC under the 1997 CCT Consent Decree "the Consent Decree", and (c) that Cadence-affiliated executives were seeking to avoid disclosure of their overlapping interests in AmmoCore and Cadence.

The Consent Decree requires notice to the FTC upon certain events, such as an investment or acquisition, and further requires Cadence to manage its inter-operability programs to allow access to third party tools. Given that any standard legal test would collapse the interests of RWI and Telos as well as certain individuals such as Jim Hogan as either Cadence "affiliates" or "agents" under the Consent Decree, it appears that throughout the last several years Cadence's position in AmmoCore exceeded the 10%

threshold for notice to the FTC, particularly since during this period AmmoCore was both OEMing Cadence's routing tool and having its interoperability strategy shaped by Cadence's affiliates and agents.

So it appears that Cadence's motivation for not completing the Asset Purchase Agreement may have been a desire to avoid notification to the FTC which might have (i) alerted the FTC to prior violations of the Consent Decree in regard to AmmoCore, (ii) heightened FTC scrutiny of other Cadence transactions (e.g., SPC, Plato, Simplex, Neolinear) that involved routing technology, (iii) impacted pending or future Cadence transactions or (iv) impacted the scheduled expiration of the Consent Decree.

Another possible reason for Cadence's failure to follow through with the Asset Purchase Agreement is that the overlapping interests of Cadence executives in AmmoCore had not been previously disclosed under Cadence's Code of Business Conduct, and therefore those executives concluded that completing such a transaction was against their individual interests.

**Other Breaches; Impact on Rights as a Creditor.** In addition to the breach of the Asset Purchase Agreement, the investigation reveals significant issues in terms of breach of fiduciary duty and breach of contract by Cadence in its dealings with AmmoCore. Those possible breaches include:

i. The divided loyalties of certain AmmoCore board members and the role of certain officers, who were being compensated by Cadence while working for AmmoCore;
ii. Failure to follow through on Cadence's representations prior to the OEM that AmmoCore was to leverage Cadence's sales and distribution channel;
iii. Interference with potential AmmoCore customer opportunities by Cadence and the usurpation of those opportunities to the benefit of Cadence;
iv. The shaping of AmmoCore's business strategy by Cadence to a "Cadence-centric" flow, to the long-term disadvantage of AmmoCore, and in clear violation of the intent (if not the plain language) of the Consent Decree; and
v. Failure to comply with the shareholder agreements.

The scope and extent of these breaches would almost certainly lead to Cadence's claims as a creditor to AmmoCore being subordinated under doctrines of equitable subordination. It is not clear the degree to which Cadence executives who had a direct financial interest in earn-outs (e.g., SPC, Plato) had decision-making authority with regard to AmmoCore, such that they might have been motivated to favor products which were driving their earn-out payments.

**Defamation.** Finally, it appears that Mr. Katsioulas may have claims for defamation against Cadence and its affiliates for damage to Mr. Katsioulas' reputation and harming his ability to start another company or find employment in EDA.

**Next Steps.** The practical reality is that the amount of energy required to fully resolve this matter is far greater than anyone wants to expend; but conversely, it is not reasonable to expect to leave AmmoCore, Messrs. Katsioulas and Aronoff, and its other shareholders and creditors entirely "holding the bag" as a result of the actions described in this letter. So I am optimistic we can quickly come to a satisfactory resolution. Again, we request a meeting with responsible Cadence executives as provided in Section 8.11 of the Asset Purchase Agreement, and if you are unwilling to enable such a meeting then we will request action by the Cadence GNC under your Code of Business Conduct.

If you could let me know by October ___ how you intend to respond and by when I would very much appreciate it.

Best

Paul


**Questions**

1. What was the financial interest of the following Cadence executives or affiliates in Telos Venture partners? Was their involvement disclosed to Cadence's Board of Directors? Was their involvement disclosed in SEC or other relevant filings?
a. Ray Bingham
b. Smith McKeithan
c. Bill Porter
d. Jim Hogan
e. Warren Lazarow

2. With respect to each of the individuals below and the relevant time period, were any of them compensated by Cadence as employees or consultants?
a. AK Kalekos, 1999-2005
b. Jim Kupec, 2002-2004
c. Jim Hogan, 1999-2005
d. Salah Werfelli, 2001-2004
e. Jim Lindstrom, 2001-2005
f. Warren Lazarow, 1999-2006

3. What was the role of the following Cadence executives in decision-making relative to AmmoCore? Was any policy put in place to ensure that their conduct was not influenced by their desire to maximize their own "earn-outs"?
a. SPC: Ping Chao, Wei-Jin Dai, Eric Filseth, Michele Cortoy
b. Plato: Limin He

4. Did Cadence notify the FTC under the "CCT Consent decree" w/r/t any of the following transactions?
a. Investments in AmmoCore

b. Acquisition of SPC
c. Acquisition of Plato
d. Acquisition of Simplex
e. Acquisition of Neolinear
f. Attempted purchase of AmmoCore's assets

5. What was the reason for Cadence's failure to complete the contemplated asset acquisition of AmmoCore in 2005? Was the structure of the decision-making process for this (non-)acquisition the same as the process for other acquisitions over the recent period?