# EXHIBIT "D"

**Sitzman, Michael A.**

| | |
|---|---|
| **From:** | Sitzman, Michael A. |
| **Sent:** | Monday, June 25, 2007 5:20 PM |
| **To:** | Sitzman, Michael A. |
| **Subject:** | FW: Lippe AmmoCore Report Follow-up |
| **Attachments:** | 2002_10_14 Cadence OEM Agreement.pdf; 2002_10_03 Cadence SPLMA Agreement.pdf; Lippe.Report.AmmoCore.Cdn.11.15.06.pdf |

**From:** Lippe, Paul (Perkins Coie) [mailto:PLippe@perkinscoie.com]
**Sent:** Thursday, November 16, 2006 6:12 PM
**To:** Tina Jones
**Cc:** tomkat@sprintmail.com; a.aronoff@comcast.net
**Subject:** Lippe AmmoCore Report Follow-up

Tina --

As we discussed, here is a draft of my internal report summarizing the antitrust and related claims of AmmoCore against Cadence.

Based on my personal experience (both in the formulation of the FTC Consent Decree and in managing investment and interoperability programs), Cadence clearly violated both the letter and spirit of the Consent Decree and improperly manipulated AmmoCore's business.

I am providing this to you as you requested to clarify these issues in pursuit of a resolution of this matter, and it is therefore our expectation that this memo remain confidential and privilieged in the context of a settlement discussion. We may disclose this memo subsequently, including doing so to the FTC in an effort to have the Consent Decree extended in order to protect AmmoCore's future ability to compete.

I realize that there has some delay on our side in providing this to you but do wish to continue to move expeditiously. I will hope to hear from you no later than November 28th on the next steps consistent with our prior conversations.

Best

Paul

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

Ex 19

6/25/2007



November 15, 2006

TO: AmmoCore Board of Directors, Tom Katsioulas and Alan Aronoff as Individual Shareholders of AmmoCore. MADE AVAILABLE TO CADENCE AS A COURTESY, NOT IN WAIVER OF ATTORNEY-CLIENT PRIVILEGE

FROM: Paul Lippe

RE: Preliminary Investigation Regarding Cadence's Conduct Towards AmmoCore

## Scope of Review

You have asked me to review the course of dealing between Cadence and AmmoCore to determine whether there is any basis to either

    a. Restrict or block Cadence's claims as a creditor; and

    b. Raise claims by AmmoCore against Cadence.

## Preliminary Conclusions

Based on an extensive review of the history of AmmoCore[1], my finding is that Cadence manipulated its dealings with AmmoCore to the disadvantage of AmmoCore and its common stockholders and to the advantage of Cadence's business, Cadence's individual executives, and Cadence's desire to avoid disclosing certain information to relevant government agencies.

While Cadence was certainly free to pursue its own business interests, AmmoCore became "road kill" to Cadence's shifting strategies, personnel and motivations, during a time that Cadence had both fiduciary and contractual duties to AmmoCore, and a time when Cadence was subject to a consent decree that was intended to protect interoperability and competition in the routing market.

When Cadence (including its affiliates) originally invested in AmmoCore, Cadence was involved in a life and death battle with Avant! and was very concerned about Cadence's next generation tool flows. Cadence was also constrained in its ability to buy or invest in routing tools by the FTC consent decree. Once Cadence bought SPC, Plato and Simplex, it faced a very different set of opportunities and constraints. While Cadence was certainly free to change its own strategy based on these changed circumstances, it appears to have also deliberately manipulated AmmoCore's strategy and relationship to Cadence to its (and its executives) own interests.

---

[1] See the factual summary below, all of which facts can be attested to by one or more percipient witnesses and company records

### Background – FTC Consent Decree

The 1997 FTC consent decree (the "Consent Decree") defines "Cadence" to includes directors, officers, subsidiaries, groups, affiliates, agents, etc., and imposes three orders to Cadence:

   a. Cadence (as part of its Connections Partner Program) must license its software to companies who need to interface with Cadence's routing tools on equal terms;

   b. Cadence must notify the FTC if it acquires stock or interest in any company, engaged in the development or sale of IC routing tools in the US within a year preceding such acquisition, unless it is solely for investment purposes and Cadence does not hold more than 10% of any class of security;

   c. Cadence must notify the FTC of its intention to acquire the assets previously used (and still suitable for use) in the development or sale of IC routing tools, if the acquisition price exceeds $5 million.

The FTC regularly audits Cadence's Connections Partner program to ensure compliance and Cadence also must file compliance reports with the FTC. If Cadence violated any of the above orders, then each violation carries at a minimum a civil fine of $11,000 per day, on a continuing basis from the date that each violation occurred. The FTC consent decree expires in August 2007.

**Claims**. AmmoCore's possible claims against Cadence include:

1. <u>Self-dealing in the formation and implementation of the Asset Purchase Agreement.</u> While "fire sale" transactions are never pretty, the terms of the Asset Purchase Agreement are atypically favorable to Cadence. Among the atypical aspects of this transaction:

   i. It appears that Cadence representatives or affiliates (i.e. Jim Hogan and Bruce Bourbon) effectively controlled AmmoCore's side of the negotiations. Gary Larsen, AmmoCore's then CEO, was excluded from negotiations, as was Tom Katsioulas. It is not clear the degree to which AmmoCore's putative counsel, Warren Lazarow, was either engaged on AmmoCore's behalf or might have been conflicted through other dealings with Cadence.

   ii. The Asset Purchase Agreement permitted (either through its terms or through the failure of the Cadence-affiliated representatives to protect the interests of AmmoCore in its enforcement) Cadence to hire away key engineers through the course of negotiating and then review source code without closing. Since it is universally understood in the EDA industry that access to source code and engineers constitutes effective control of intellectual property, AmmoCore's interests were not protected in the transaction.

   iii. Throughout the history of AmmoCore, Cadence representatives and affiliates shaped the business and technical strategy of AmmoCore to focus AmmoCore's interface and inter-operability on Cadence's routing tools, despite AmmoCore's desire to link

with other tools such as Synopsys and Magma. As a result, AmmoCore's possible value to another EDA purchaser was diminished, and with it its negotiating leverage vis-à-vis this highly one-sided Cadence transaction.

iv. The Asset Purchase Agreement was precipitated by the Company's running out of cash and lack of alternatives for fund-raising or other buyers. However, the Company had closed on a first tranche of an insider bridge loan and had been assured by the investors (primarily Cadence and affiliates) that further funding was forthcoming. AmmoCore's CEO Gary Larsen would have pursued other funding alternatives had he known that he would be in such a dire situation as emerged.

v. Overall, it appears the Cadence as a creditor, shareholder, board member, and fiduciary did not seek to maximize the value of AmmoCore in the disposition of its assets.

2. <u>Cadence's failure to follow through with the Asset Purchase Agreement.</u> Notwithstanding the highly favorable terms of the Asset Purchase Agreement, Cadence failed to follow through on its terms. It appears that the most likely reasons for Cadence's actions were (a) that it had already effectively transferred the AmmoCore IP through the hiring of AmmoCore engineers and access to the source code, (b) that Cadence was seeking to avoid a transaction that would require notice to the FTC under the Consent Decree, and (c) that Cadence-affiliated executives were seeking to avoid disclosure of their overlapping interests in AmmoCore and Cadence.

Given that any standard legal test would collapse the interests of RWI and Telos as well as certain individuals such as Jim Hogan as either Cadence "affiliates" or "agents" under the Consent Decree, it appears that throughout the last several years Cadence's position acquired interest in AmmoCore exceeded the 10% threshold for notice to the FTC, particularly since during this period AmmoCore was both OEMing Cadence's routing tool and having its interoperability strategy shaped by Cadence's affiliates and agents.

Cadence's motivation for not completing the Asset Purchase Agreement may have been a desire to avoid notification to the FTC which might have (i) alerted the FTC to prior violations of the Consent Decree in regard to AmmoCore, (ii) heightened FTC scrutiny of other Cadence transactions (e.g., SPC, Plato, Simplex, Neolinear) that involved routing technology, (iii) impacted pending or future Cadence transactions or (iv) impacted the scheduled expiration of the Consent Decree.

Another possible reason for Cadence's failure to follow through with the Asset Purchase Agreement is that the overlapping interests of Cadence executives in AmmoCore had not been previously disclosed under Cadence's Code of Business Conduct, and therefore those executives concluded that completing such a transaction was against their individual interests.

3. <u>Antitrust Violations.</u> Cadence's involvement in the management of AmmoCore's business appears to represent a violation of the Consent Decree and give rise to private antitrust rights for AmmoCore. The bases of these claims include:

i. The divided loyalties of certain AmmoCore board members and the role of certain officers, who were being compensated by Cadence while working for AmmoCore;

ii. Failure to follow through on Cadence's representations prior to the OEM that AmmoCore was to leverage Cadence's sales and distribution channel;

iii. Interference with potential AmmoCore customer opportunities by Cadence and the usurpation of those opportunities to the benefit of Cadence;

iv. The shaping of AmmoCore's business strategy by Cadence to a "Cadence-centric" flow, to the long-term disadvantage of AmmoCore, and in clear violation of the intent (if not the plain language) of the Consent Decree; and

v. Failure to comply with the shareholder agreements which contemplated a limited role for Cadence in the management of AmmoCore, such that Cadence controlled AmmoCore.

Under the Consent Decree, each violation is subject to a daily fine up to $11,000.

4. OEM Agreement.

The OEM relationship with Cadence complicated AmmoCore's business, since AmmoCore sold Cadence's routing tool in the U.S. Cadence enabled to accelerate AmmoCore's product development by supplying multiple tools with the SPLMA, however it inhibited AmmoCore's business as follows:

a. The OEM forced AmmoCore - while its Fabrix Enterprise Platform solution was positioned as a competing EDA tool - to introduce much higher pricing than competing EDA tools, while fixing a minimum price for Cadence's tools;

b. It limited AmmoCore's ability to penetrate major accounts since EDA products are typically heavily discounted by early stage startups during the initial market introduction, while Werfelli was quoting Fabrix pricing above market average;

c. It essentially inhibited AmmoCore from marketing its technology to the installed base of Cadence's competitors and confined AmmoCore to Cadence's installed base, by tying the sale of Fabrix with Cadence's top level routing tool;

d. It created a channel conflict and elongated AmmoCore's sales cycle, as the Company ended-up competing with Cadence for the same customers and for the same budget using Cadence's older generation placement and routing tools;

e. It forced AmmoCore to waste time and cash to develop placement technology and to evaluate third party routing tools, while restricting Fabrix to 20 licenses, effectively limiting the output per engineer and supply of tools per customer; and

f. It effectively disabled AmmoCore from building any value in the market place since Cadence competitors would be unlikely to bid for a Cadence-centric solution which was OEMing Cadence's routing tool.

5. <u>Defamation</u>. Mr. Katsioulas may have claims for defamation against Cadence and its affiliates for damage to Mr. Katsioulas' reputation and harming his ability to start another company or find employment in EDA.

This report will not address Cadence's internal corporate governance issues that arise out of its affiliated investor activities.

In sum, Cadence's manipulations of AmmoCore made AmmoCore Cadence's alter ego at least from the time of Mr. Katsioulas' departure from AmmoCore's board, and the OEM Agreement and related actions and obligations constituted a clear violation of the Consent Decree.

## **Cadence Explanation: Conflicting Motivations**

Given that Cadence and its affiliated investors lost money as a result of AmmoCore's failure, it is reasonable to ask why Cadence would have deliberately aided that outcome. It appears that Cadence and its affiliated investors and executives may have been motivated by several "Cadence-centric" considerations that outweighed any interest in the success of AmmoCore:

1. A desire to protect the business interests of Cadence, particularly after key Cadence acquisitions, which could have been adversely impacted by the "disruptive" nature of AmmoCore's technology and business model;

2. A desire to avoid disclosure of conflicting and apparently undisclosed overlapping interests among both investing entities and individuals affiliated with Cadence and Cadence itself;

3. A desire to prevent the acquisition of AmmoCore technology by a Cadence competitor;

4. A desire to avoid notifications to the FTC or SEC which might have alerted those agencies to the absence of prior required notifications; and

5. The interest of Cadence executives who had a direct financial interest in earn-outs (e.g., SPC, Plato) to favor products which were driving their earn-out payments.

**Background Facts**

1. AmmoCore was founded in September 1999 by Tom Katsioulas, Stan Chow, Jacob Avidan and Dimitri Fotakis. The four founders raised $2.5 million through the sale of convertible promissory notes from 48 individual investors.

2. AmmoCore developed an Enterprise and IP Platform called Fabrix, which enabled customers to reduce time-to-market for complex IC design by using an increased number of third party placement and routing tools. AmmoCore did not plan to develop, license or sell placement and routing tools, but to leverage and complement leading EDA suppliers offering such tools in order to develop a unique business model.

3. Fabrix increased productivity through the massive deployment of third party placement and routing tools, and required to interface with a much higher number of tools than the typical EDA startup. Starting in November 1999, Cadence supplied several placement and routing tools to AmmoCore as part of its Connections Partner program. AmmoCore used Cadence's tools for technology development and Cadence renewed the licenses for its tools frequently.

4. In late 2000, AmmoCore received a term sheet from Crescent Ventures for an $18 million pre-money valuation. Cadence decided to invest and become a strategic partner of AmmoCore. Telos Venture partners also decided to invest.

5. AmmoCore converted the 48 Note holders into Series-A, and raised approximately $13.7 million for the Series-B financing. The investors were Cadence, RWI Group ("RWI"), Telos Venture Partners ("Telos"), Donald L. Lucas and other affiliated investors. Additional venture investors were Bay Partners ("Bay") represented by Bob Williams and Crescent Ventures ("Crescent") represented by Kevin Hall.

6. There where were a number of conflicts of interest related to Cadence and its affiliated investors, some of which were not disclosed to AmmoCore:

- Cadence directly owned more than 70% controlling interest in Telos Venture Partners, with Telos' remaining funds being investments of Cadence executives;

- Donald L. Lucas ("DLL") was the chairman of the board of Cadence and Donald A. Lucas ("DAL") was the founding partner of RWI;

- Ray Bingham (Cadence's then-CEO) was an investor at RWI. DLL and Bingham acted as Cadence's investment committee regarding Telos investments;

- Telos' general partners AK Kalekos and Bruce Bourbon reported to DLL and Bingham with respect to the investments of Telos, including AmmoCore;

- Cadence's Sr. VP Jim Hogan was in charge of Cadence's investments, mergers and acquisitions, reporting to Cadence's directors Bingham and DLL respectively;

- Most of the above individuals were individual stockholders of Cadence.

7. During the Series-B financing the above individuals represented that Telos and RWI were independent venture entities, which were not influenced by Cadence. The Series-B closing documents include no acknowledgement that Cadence, Telos and RWI were affiliated. However, Kalekos and Bourbon had periodic reviews with Bingham and DLL, who influenced Telos' investments.

8. The Board consisted of two seats representing the Series-B preferred stockholders held by Kevin Hall and Jim Hogan, and two seats representing the common stockholders held by founders Katsioulas and Chow. The voting agreement specified that a fifth Board seat (the "At-large" seat) was to be filled through the consent of all four directors. AK Kalekos from Telos, DAL from RWI and Bob Williams from Bay Partners were observers at the Board meetings.

9. Post Series-B and on a fully diluted basis the Company had 22,860,566 shares outstanding, including an option pool of 2,625,000 allocated for the Common. The common stockholders controlled 48.1% and influenced 9% of the preferred stock from the individual Series-A investors (family and friends). From the remaining preferred stock Cadence owned 9.4%, Telos owned 6.2%, RWI 7.8%, and DLL with affiliates 6.1%. Cadence and Telos combined controlled 15.6% of AmmoCore and all Cadence affiliates combined, controlled 29.5% of the company. Cadence, Telos, RWI and DLL owned 18.1%, 12%, 15.1% and 11%, respectively of the Series-B preferred stock.

10. In March 2001 and during the first board meeting right after the Series-B, Hogan and Kalekos recommended to Katsioulas to pursue a more aggressive operating plan in order to seize the 130nm market window by early 2002. Katsioulas presented the new plan to the Board a month later.

11. In April 2001, Katsioulas proposed to the Board to elect Bill Lattin, a well-known former Intel and Synopsys executive as a candidate for the fifth director. Hogan and Kalekos posed concerns regarding Lattin and the Board did not pursue him. Later, Hogan confided to Katsioulas that DLL did not want to have Lattin on the Board because of his affiliation with Synopsys, Cadence's leading competitor.

12. In March 2001, Cadence supplied to AmmoCore multiple placement and routing tools for product development and the two companies collaborated in product integration, testing and customer engagements and with Innotech Corporation (Cadence's distributor in Japan). Over 20 Cadence employees were involved with AmmoCore in different aspects of the collaboration with Cadence.

13. In August 2001, Katsioulas, Aronoff, and consultants Mike Loo, Tim Barnes and Bob Leach (a task force approved by the Board), presented to AmmoCore's Board a business model which scaled by increasing the number of third party placement and routing tools and through recurring tape-out fees based on AmmoCore's IP.

14. In November 2001, upon two prior private requests by DLL to Katsioulas and a motion at a Board meeting by observer DAL, Katsioulas and Chow agreed to elect Telos' partner AK Kalekos to the Board (in addition to Cadence's Jim Hogan), provided that two more seats be added to maintain the balance as specified in the prior voting agreement.

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484.3

Kalekos was elected to hold the At-large seat and the number of seats was increased to 7 from 5.

15. Kalekos was appointed to be the head of the CEO search committee and accelerated an ongoing CEO search for AmmoCore conducted by Heidrick & Struggles ("H&S"). Around that time Synopsys acquired Avant! Corporation for approximately $830 million and Cadence acquired Silicon Perspectives ("SPC") for $134 million initial price (with earn-outs that ultimately exceeded $300 million) to strengthen their respective tool-based Netlist-to-GDSII flows.

16. By December 2001, (i) Aronoff and Innotech's Toshi Kaneko had tested the viability of the business model in Japanese accounts, and (ii) Aronoff started discussions with Cisco to license Fabrix to Cisco. Hogan agreed to have Cadence's sales rep for Cisco work jointly with AmmoCore's sales rep on Cisco. As a result of the Cisco engagement, Katsioulas and Aronoff collaborated with Cadence's Hogan and Callaghan to develop and validate the business model between AmmoCore and Cadence.

17. Hogan committed on behalf of Cadence to sell jointly with AmmoCore into three major accounts (Hogan referred to this as the "three silver bullets") in order to validate the business model, prior to finalizing a business agreement between Cadence and AmmoCore, to leverage Cadence's sales channel. Callaghan and Aronoff put in place a sub-licensing agreement to facilitate this interim joint selling arrangement.

18. In early 2001, H&S recommended Jim Kupec as a candidate for the CEO position and Kalekos claimed that the due diligence on Kupec was positive, even though Handel Jones pointed out to Kalekos that Kupec was an unsuitable candidate for AmmoCore, because Kupec lacked domain experience. Certain Board members questioned the large compensation package proposed by H&S. Hogan supported the proposal for Kupec and the package was approved.

19. In January 2002, Katsioulas met with SPC's CEO Ping Chao, to discuss collaboration with SPC's tools. Katsioulas also developed a plan to support the placement and routing tools of Avant!/Synopsys as the second industry-leading tools after Cadence. Hogan requested Katsioulas to (i) favor the Cadence tools by delaying support of the Synopsys/Avant! tools, and (ii) suggested that Katsioulas evaluate Silicon Valley Research ("SVR") as another alternative, even though SVR had no position in the market (Cadence was paying SVR consulting fees to keep them alive, since SVR had filed a lawsuit to Avant! with Cadence's settlement pending).

20. In February 2002, Cadence acquired for $55 million Plato Corporation, which developed and marketed a routing tool. Shortly before Kupec started as CEO of AmmoCore, Katsioulas sent a memo to Hogan outlining certain opportunities and risks related to AmmoCore's key core competencies and Cadence's recent acquisitions of SPC and Plato. Hogan agreed that AmmoCore would receive the newer generation tools from SPC and Plato as soon as the acquisitions were completed. Up to this point Cadence had supplied AmmoCore multiple licenses of its placement and routing tools, which Cadence renewed

frequently. Hogan claimed that this was required because Cadence's Connections Partners was being audited by the FTC frequently.

21.   In February 2002 Board meeting, Katsioulas resigned as the President and CEO to be replaced by Kupec. Katsioulas became VP of Marketing, while he remained to be director representing the common. Stan Chow resigned from the Board, surrendering his common seat to Kupec and the prior agreement to maintain the balance for the common was not observed. As a result, 2 out of 7 Board seats remained vacant. Kalekos pressed for AmmoCore to hire a "dealmaker" and Hogan suggested Salah Werfelli, a Cadence executive.

22.   In March 2002, AmmoCore closed a sale to NEC Europe, validating AmmoCore's business model. The Company had finalized a distribution agreement with Innotech and was about to close two more deals with Cisco and Toshiba U.S. Katsioulas requested that AmmoCore stop the SVR evaluation, as AmmoCore had developed a plan to support the Synopsys tools. However, R&D continued to evaluate the SVR tool without Katsioulas' knowledge based on Kupec's direction. Kupec made an offer to Werfelli without any due diligence, claiming that the Board approved him. Katsioulas resigned from the company and the Board.

23.   In April 2002, Kalekos denied Fotakis' request that one of the founders assume Katsioulas' seat to represent common shareholders, which would have been in line with the voting agreement. As a result, none of the founders were present on the Board. Werfelli started in mid April as the VP of marketing and sales and was also appointed as an officer. Hogan had not yet honored his promise of supplying the newer tools from SPC and Plato.

24.   Starting in May 2002, and based on Werfelli's approach, AmmoCore changed its strategy away from the Fabrix Enterprise/IP business model. Werfelli began to position AmmoCore as an EDA supplier selling Fabrix on a license basis rather than its IP business model, often competing with Cadence and at a substantially higher price. Werfelli quoted to Cisco an annual EDA license fee of $1.5 million, while SPC and Plato combined were selling for less than $500,000. As a result, Cisco decided to buy Cadence's tools and not Fabrix.

25.   In May 2002, Cadence acquired Simplex for $350 million; Simplex had developed a routing tool called the X Architecture. Upon Bingham's approval, Hogan hired Katsioulas as a consultant to Cadence, intending to fund a project in connection with AmmoCore. AmmoCore stopped the evaluation of the SVR routing tool and started to evaluate another unproven routing tool from PulseIC.

26.   In May 2002, Werfelli claimed to the Board a $32 million bookings pipeline with Fujitsu alone. AmmoCore also contemplated an OEM agreement whereby AmmoCore would resell Cadence tools, and pay Cadence a 20% royalty for embedding Cadence's tools into Fabrix.

27.   By June 2002, AmmoCore had not reduced the burn rate as had been discussed by the board post 9/11, and instead it increased headcount and launched a major campaign in Japan. Werfelli de-emphasized AmmoCore's focus in US accounts (Cisco, Toshiba, Ciena, BroadCom and others) and focused in Japan. Kupec positioned the Company as a competitor to Magma and Cadence.

28. In June 2002, Werfelli replaced Innotech as AmmoCore's Japanese distributor with SC High Tech. Innotech, (which Cadence acquired a year later) was a key distribution channel for AmmoCore as part of the joint selling with Cadence. According to Matthias Voigt of NEC Europe, AmmoCore stopped pursuing the agreed milestones as part of the licensing agreement that were tied to revenues.

29. Hogan resigned from AmmoCore's Board in July of 2002 and a month later, from Cadence. Around the same time Hall stopped attending the Board meetings. The Board consisted only of Kalekos (the At-large designee) and Kupec (the Common designee). Upon Bingham's recommendation the Company hired Jim Lindstrom, another Cadence former executive and AmmoCore's CFO. Werfelli and Lindstrom were being paid by Cadence, while being employees of AmmoCore.

30. From September to October 2002, Werfelli was gone in Japan "closing business," according to Kupec. Aronoff questioned Kupec whether Werfelli was spending 100% of his time working on AmmoCore business, but Kupec refused to answer his question. According to Munir Ahmed, Werfelli was not attending customer meetings in Japan.

31. In late September 2002, Kupec represented to the Board that there were $4.4 million in bookings from Fujitsu and $5.2 million from other bookings, with cash payments being received between Q3 and Q4 of 2002. In the same meeting Kupec presented to the Board a justification for AmmoCore licensing other third party routing tools (PulseIC, ViASIC, Synopsys, Magma, Monterey, etc.) and discussed the proposed terms for licensing Cadence's placement and routing tools.

32. On October 17th 2002, Michael Williams (Cadence's VP and associate general counsel) signed two separate agreements with AmmoCore: (i) a Specific Purpose License and Maintenance Agreement ("SPLMA"), and (ii) a Software OEM License Agreement ("OEM") pursuant to which AmmoCore was to sell Cadence's tools as part of Fabrix (see attached). Cadence's VP Michele Cortoy claimed to Aronoff, that it was necessary to enter into an OEM because that was the only way under the FTC Consent Decree for Cadence to supply placement and routing tools to AmmoCore with certain favorable terms. These changes followed both Katsioulas' departure from AmmoCore's board and the relevant Cadence and Synopsys acquisitions described elsewhere.

33. In November 2002, AmmoCore raised approximately $8 million for the Series-C financing at a $32 million post-money valuation. Werfelli solicited Sumitomo bank and their U.S. subsidiary Presidio, which invested $2 million each. All the investors from Series-B investors participated on pro rata basis but Cadence chose not participate at all, however Cadence's affiliates (Telos, RWI, DLL and others), acquired more than 10% interest in Series-C stock. Bay Partners increased his position by investing $1.4 million above pro rata. Post Series-C, Cadence and Telos combined owned 12.1% of AmmoCore. Cadence, Telos, RWI, DLL and affiliates combined controlled 24.4% of the Company, Bay Partners 9.4% and Sumitomo with Presidio 10.3%.

34. As part of the financing, there were changes in AmmoCore's Board and it appears that prior voting agreements were not observed. Kevin Hall resigned. Williams was elected to

-10-

be a director representing the Series-C investors and Glen Antle was elected to be an At-large director. Kalekos remained on the Board but there is no record clarifying whether Kalekos continued to hold the At-large seat or whether he became the Series-B designee. Katsioulas' seat and another At-large seat remained vacant.

35. In November 2002, Fabrix (using Cadence's older generation placement and routing tools) beat Cadence new Encounter flow (using the newer tools from SPC, Plato and Simplex) at Toshiba-US. However, "AmmoCore's sales was not interested in selling Fabrix" according to Hideki Yamada, a Toshiba-US manager.

36. In early December 2002 (after the closing of Series-C and a few months after presenting to the Board the expected cash payments from Fujitsu), Kupec and Werfelli reported to the Board that AmmoCore would not meet its forecast because "the technology did not work". However, when the founders confronted Werfelli on Toshiba, he claimed that he was "working on bigger deals in Japan and that Toshiba was peanuts".

37. In January 2003, (upon Hogan's recommendation) Katsioulas sent a letter to AmmoCore's Board raising questions about the high burn rate and the changes in market positioning and the new strategy, urging the Board to restore the original strategy. Katsioulas' attorney Eric Kastner questioned AmmoCore's corporate counsel Warren Lazarow about the role of former Cadence executives and other potential irregularities. However, no satisfactory responses were given to the above questions.

38. Shortly after the letter, Kupec trimmed the head count. Aronoff, Ahmed and Stahel were among the employees who were laid off that had prior knowledge and experience with the Fabrix business model. Williams began an investigation, after AmmoCore's former HR and finance director forwarded to Williams certain emails, she had sent to Hall in October 2002.

39. Kupec replied to Katsioulas' letter but he did not provide any satisfactory answers and misrepresented certain facts. Katsioulas replied to Kupec, clarifying such facts and asked more questions, which caused several discussions between the founders, the Board and the investors. Hogan (who was involved in discussions with the Board, DLL and Bingham), recommended Gary Larsen as a new CEO candidate. An email suggests that certain AmmoCore's HR records were destroyed.

40. In March 2003, Gary Larsen replaced Kupec as the CEO and member of the Board representing the common stockholders. Kalekos resigned and Bruce Bourbon (the other Telos partner) assumed Kalekos' seat. Board. Bill Baumel (the other RWI partner) replaced DAL as an observer. Cadence transferred its stock to Cadence Ireland Ltd, a Cadence subsidiary. According to Hogan the investors started discussions to re-price the company, claiming that Kupec had deceived the investors by setting false expectations, which resulted in a "high valuation in Series-C".

41. In May 2003, Hogan was elected to be an AmmoCore director, filling Katsioulas' vacant seat representing the common stockholders. The company maintained its burn rate and did not downsize, despite Larsen's prior intent to do so. According to Larsen, Hogan recommended not to lay off Werfelli and asked Larsen to increase Werfelli's salary. In June

2002, and based on Hogan's input, Larsen retained Katsioulas as a consultant by AmmoCore to assist with product strategy.

42. In August 2003 AmmoCore closed a $3.6 million three-year contract with Fujitsu, for a net of $2.7 million after commissions to SC High Tech (not including any royalties owed to Cadence as a result of the OEM). While AmmoCore had engaged in the sale of Fabrix in the U.S. during 2003, it evaluated routing tools from Silicon Design Systems ("SDS") and Monterey, but did not license any of them. Instead, Cadence renewed the OEM with AmmoCore to license only Cadence's routing tool.

43. In November 2003, the Company failed to achieve its revenue forecast and raised $7 million pursuant to its Series D financing, in an insider round at a $25 million post-money valuation and significant anti-dilution provisions favoring the preferred investors. The Series-D documents also reflect that the Board had retroactively approved for Werfelli and Lindstrom (both officers of AmmoCore) to consult for Cadence, (even though they were paid by Cadence before the Series-C financing). All the investors participated on a pro rata basis, including Cadence.

44. Cadence and its affiliates acquired more than 10% of AmmoCore's Series-D stock. Post Series-D Cadence and Telos combined controlled 15.5%, and the Cadence-affiliated parties controlled 32.8% of AmmoCore (with a major portion of the common stock option pool not being utilized). A number of key engineers became disenchanted with the dilution of the common stock and resigned. The founders' control had been reduced to 10% post Series-D, from 26.2% post Series-B.

45. The terms of the financing were proposed by Bill Baumel of RWI, who was elected to be a director. The Series-D voting agreement reflects that the number of common seats was reduced to 1 from 2 and that the investors agreed among themselves that the Series-B, Series-C and Series-D preferred stock designees were Telos, Bay Partners and RWI respectively. Since Larsen held the only common seat left, Hogan presumably assumed the other At-Large seat.

46. In early 2004, Hogan joined Telos as a general partner, but remained on the Board of AmmoCore, claiming that since he was a common stockholder his interests were allied with the common stock, even though Hogan reported to DLL, who was in charge of Cadence's investment committee for Telos. AmmoCore terminated Werfelli and hired another former Cadence executive as the VP of US sales, Steve Flannery.

47. In February 2004, Fabrix was proven in production at Fujitsu with working silicon for a complex IC design. Hogan claimed that Fabrix was not proven with "high-end" designs, which was needed for Cadence to acquire AmmoCore. A month later, Telos retained Katsioulas as a consultant to help with the business plans of potential startup investments in anticipation of funding a project in connection with AmmoCore. Cadence acquired Neolinear for approximately $90M. Cadence and RWI were investors in Neolinear, which sold a routing tool and had an OEM with Cadence.

48. By June 2004, AmmoCore had gained momentum in several major U.S. accounts: ATI, LSI Logic, BroadCom (where Fabrix beat Magma on a small "high-end" design), S3, and

Freescale. In Japan, AmmoCore beat Cadence and Synopsys at Renesas (but lost the business to Synopsys, which a closed a corporate deal with Renesas), closed a $1.2M booking with NEC and was about to close a $2.5M repeat sale to Fujitsu. A junior engineer at Fujitsu completed a complex IC design using Fabrix in a few weeks while a larger design team using Cadence's flow was unable to finish the same design.

49. In July 2004, there was a delay with the Fujitsu sale. Hogan went to Japan on behalf of AmmoCore to negotiate the closing of the sale but came back empty handed. Cadence closed a $250 million deal with Fujitsu and the $2.5 million budget reserved for AmmoCore went to Cadence's corporate deal (according to Larry Yamada, AmmoCore's VP of Asian Sales), costing revenues which were vital for AmmoCore's survival. Hogan claimed that SC High Tech was responsible for the failure at Fujitsu. Lindstrom was let go in August 2004.

50. In September 2004, AmmoCore ran out of cash and was forced to reduce headcount significantly. The investors agreed to fund the Company based on a note and warrant investment in two tranches (the "bridge loan") negotiated by RWI and affiliated parties, all of which committed to participate. Sumitomo and Presidio followed, but Bay Partners waited, according to Board minutes. RWI was assigned as the collateral agent in the event of a default on the loan. Cadence invested in the bridge loan on a pro rata basis and factored in an additional $400,000 in royalties owed by AmmoCore, as a result of the OEM agreement and prior sales.

51. In October 2004, and while AmmoCore had closed a $1.2 million booking with NEC-Japan, Cadence cut-off support its routing tool to AmmoCore, while $700,000 of expected revenues were contingent upon AmmoCore's success at NEC. According to Larry Yamada, Cadence kept stalling after he requested an official support channel. This occurred around the time that the bridge loan was being negotiated with Cadence. During the same month Cadence's SPLMA for supplying routing tools to AmmoCore expired, however Cadence did not renew the agreement.

52. In October 2004, AmmoCore held the first closing of the first tranche for $2.5M which would provide operating funds until January 2005. Cadence and affiliates acquired more than 10% interest in the Notes of the bridge loan. The closing documents of the bridge loan state that AmmoCore made serious attempts to solicit outside funding, but Larsen claimed that the Company approached only two VCs. One of the VCs was interested to invest, but Telos was not interested to work with them, Larsen said.

53. In November 2004 the Company had raised $2.9 million in what was expected to be the first tranche of a bridge loan. Several preferred stockholders who decided not to participate in the bridge loan including Bay Partners, had their stock converted to common and the founders lost controlling interest of the common stock and vote. In December 2004, Bay Partners' Bob Williams resigned from the Board. Hogan claimed to Katsioulas that the second tranche of the bridge loan would close in January 2005.

54. In early January 2005, Hogan assured Larsen that the second tranche of the bridge loan had been secured, according to Larsen. Around the same time Renlin Chang told Aronoff in Japan that he was very upbeat about NEC's intention to use Fabrix in the NIMS subsidiary

of NEC. About a week later, Bourbon informed Larsen that the investors were no longer willing to fund AmmoCore, according to Larsen. Hogan claimed that while he was on vacation DLL approached Bourbon and Baumel suggesting that it may not be wise to invest good money after bad.

55. According to an affidavit by Lisa Fontenot by Gibson Dunn representing Cadence, "the holders of a majority of the outstanding principal amount of the Notes", informed the Company that they would not fund the second tranche of the bridge loan. Excluding Sumitomo and the small creditors, Cadence and affiliated parties held 64% of the outstanding notes.

56. AmmoCore's precarious situation leaked to the press in January 18, 2005. According to Larsen, when the 'air supply' was cut-off, there was no time to react and properly position AmmoCore for acquisition, and therefore Cadence was the only possible acquirer. Hogan and Bourbon handled the negotiations with Cadence by themselves and did not include Larsen. In addition, Hogan denied Katsioulas' offer to assist in explaining the value of AmmoCore to Cadence. AmmoCore's corporate counsel (Warren Lazarow) was aware of the above facts and conflicts.

57. According to founder Jacob Avidan, AmmoCore's staff presented the Company and the technology to several EDA companies. Avidan claims that Synopsys' Paul Lo, was wondering why AmmoCore had not attempted to raise any funding, given its impressive results and customer pipeline. Cadence's Wei-Jin Dai approached Avidan to recruit him at Cadence. Avidan confronted Hogan and Bourbon who claimed that nobody was interested to invest and asked Avidan to arrange for a presentation to Dai. However, Dai did not respond and there was no presentation given to Dai, Avidan said. Meanwhile Cadence solicited AmmoCore' key engineers and hired a number of them.

58. A number of small companies expressed an interest in AmmoCore's assets. Athena Design Systems offered to acquire the assets for stock. However, Hogan did not follow up, according to Fotakis, Athena's founder. Cadence purported to offer $2 million for AmmoCore's assets and that the Board started discussions in February 2005 with Tom Romero to appoint him as the liquidating agent. AmmoCore cleaned up all the paper records from the offices and did not back up sales and marketing employee electronic records, according to Tom Gee (AmmoCore's IT director).

59. In April 2005, when AmmoCore's Board approved AmmoCore's asset sale to Cadence for $2 million, three out of five of AmmoCore's directors (Hogan, Bourbon and Baumel) were investors and creditors affiliated with Cadence. A month later AmmoCore's stockholders consented to the attempted asset sale. Even though 3 out the 4 founders did not consent, a majority of the common stockholders approved the asset sale, through the swing vote of Bay Partners.

60. In June 2005, AmmoCore finalized all the legal work for the closing of the transaction. AmmoCore assigned its patents and trade secrets to Cadence and transferred its source code to Cadence via web server. The closing was to have completed through Cadence's confirmation of the receipt of the source code. However, there was a delay in the final closing, because Cadence attempted to install and verify the software.

-14-

61. In early August 2005, (shortly after Bingham resigned from Cadence and over a month after Cadence's receipt of AmmoCore's IP), Cadence withdrew from the transaction, claiming it could not verify the code.

62. The Board did not dissolve AmmoCore as approved by the stockholders. Instead, Hogan approached Fotakis and Katsioulas separately, purporting to maximize the value of the IP. Several proposals were submitted to Baumel, but Bourbon and Baumel were not interested to pursue them, according to Hogan. During that time, a number of AmmoCore's patents were lost as Baumel refused to pay for filing fees.

63. In November 2004, Larsen resigned from the Board of AmmoCore. In December 2004, shortly after Katsioulas' attorney sent a notice to Telos and RWI with respect to a demand letter being sent to Cadence, the Board of AmmoCore resigned "en masse" and there was a report in EE Times that Cadence was dissolving Telos.