EXHIBIT "E"

**Sitzman, Michael A.**

| | |
|---|---|
| From: | Sitzman, Michael A. |
| Sent: | Friday, June 22, 2007 2:14 PM |
| To: | Sitzman, Michael A. |
| Subject: | FW: AmmoCore Report Clarifying AntiTrust Issues (sent from home email) |
| | |
| Attachments: | Lippe%20Report.AmmoCore.Cdn.12.14.06.pdf |



Lippe%20Report.A
mmoCore.Cdn.12...

----- Original Message -----
From: Paul Lippe <plippe@gmail.com>
To: Tina Jones
Cc: Tom Katsioulas <tomkat@sprintmail.com>; Lippe, Paul (Perkins Coie)
<plippe@perkinscoie.com>; Alan P. Aronoff <aaronoff@keyasic.com>
Sent: Wed Dec 13 21:27:58 2006
Subject: AmmoCore Report Clarifying AntiTrust Issues (sent from home email)

Tina -

Thanks for chatting the other day. I understand that it is your position that there is no substance to AmmoCore's antitrust claims. I have reviewed the facts again and concluded that the antitrust claims are quite strong, both in light of Cadence's conduct toward AmmoCore, Cadence's other actions in the market, the letter and spirit of the Consent Order, and my own personal experience with these issues. I have tried to provide such clarification in this report in the interest of our reaching a shared understanding of the appropriate resolution of these claims.

I am providing this to you for a final time to invite comment and clarification; we'd be happy to look at any counter-vailing arguments from your antitrust counsel before releasing this to shareholders and others.

If you could reply no later than end of day Monday, December 18, I would appreciate it.

Best

Paul

--
Paul Lippe
650 533-4058

1

Ex 18



December 13, 2006

TO:        AmmoCore Board of Directors, Tom Katsioulas and Alan Aronoff as
           Individual Shareholders of AmmoCore. MADE AVAILABLE TO CADENCE
           AS A COURTESY, NOT IN WAIVER OF ATTORNEY-CLIENT
           PRIVILEGE

FROM:      Paul Lippe

RE:        Investigation Regarding Cadence's Conduct Towards AmmoCore

---

## Scope of Review

You have asked me to review the course of dealing between Cadence and AmmoCore to
determine whether there is any basis to either

    a.  Restrict or block Cadence's claims as a creditor; and

    b.  Raise claims by AmmoCore against Cadence.

## I. AMMOCORE KEY FACTS

AmmoCore was founded in late 1999 to develop Fabrix, a next generation tool flow intended to
reduce the design turnaround time of integrated circuits ("ICs") through the deployment of
market leading placement and routing ("P&R") tools, enabled by AmmoCore's patented SBlock
Architecture intellectual property ("IP"). AmmoCore intended to complement the leading P&R
tool suppliers to develop an Enterprise plus IP business model that added value to the EDA
industry.

When AmmoCore was founded, Cadence was involved in a market share battle with Avant! and
very concerned about its P&R tool flows. Cadence was also constrained by the FTC from
investing in or acquiring companies selling routing tools and was required to license Cadence's
software to companies who needed to interface with Cadence's routing tools on equal terms.

In the early days of AmmoCore, Cadence supplied to AmmoCore multiple P&R tool licenses for
product development outside the Connections Partners Agreement and continued to renew the
licenses frequently through temporary product loan agreements.

In early 2001, competition in the P&R tool flow market grew as Magma gained momentum.
Cadence made additional P&R tools available to AmmoCore to accelerate product development
and invested in AmmoCore together with other Cadence-affiliated parties RWI Group ("RWI"),
AmmoCore and Cadence collaborated successfully until late 2001.

Beginning in late 2001, while AmmoCore was transitioning from product development into
Fabrix sales engagements, several industry events occurred, altering Cadence's behavior toward

asset purchase unexpectedly, a month after receiving Fabrix software code and IP, and subsequently the Cadence-affiliated Board of AmmoCore resigned. At the same time Telos was dissolved.

During 2006, after repeatedly proposing approaches to preserve the value of the Company, Tom Katsioulas was elected through 80 stockholder consents to be the sole director of AmmoCore and attempted to take control of the assets, but Cadence and affiliated insider creditors filed for an involuntary petition for Chapter 7 in the Delaware Bankruptcy Court.

In mid 2006, AmmoCore held a court-ordered annual stockholders meeting to elect directors. Cadence and affiliated petitioning creditors were present but withheld their vote. AmmoCore elected a new Board through the vote of over 70 stockholders.

Over the past four years, with different acquisitions and technology shifts, the RTL-to-GDSII market has been consolidated. The Netlist-to-GDSII (the P&R flow) portion of the market is dominated by the "all-you-can-eat" deals and many start-ups, including SVR Reshape, Monterey, InTime, ICinergy, Silicon Dimensions, Tera, Silicon Design Systems, AmmoCore and others have closed their doors.   Overall, the protective intent of the FTC consent order does not appear to have been served, and Cadence's conduct toward AmmoCore was particularly abusive.

## II. PRELIMINARY CONCLUSIONS

My investigation has included reviewing certain records of AmmoCore, and speaking to former executives, customers and other industry members.  I was formerly GC and SVP of Business & Market Development for Synopsys, and so am quite familiar with issues of EDA industry structure, competitive strategy, interoperability strategies, as well as the genesis of the FTC Consent Order.

Based on my review of the history of AmmoCore[1], my conclusion is that Cadence manipulated its dealings with AmmoCore to the disadvantage of AmmoCore and its common stockholders and to the advantage of Cadence's business, Cadence's individual executives, and Cadence's desire to avoid disclosing certain information to the FTC.   I recommend that if Cadence is unwilling to provide an adequate settlement, that you consider informing the FTC of the issues raised in this investigation in order to extend the Consent Order to protect AmmoCore's ability to compete and develop the factual predicate needed for a private antitrust action.  In addition, AmmoCore has excellent arguments to subject Cadence's position as a creditor to the doctrine of equitable subordination, as well as substantive claims for antitrust, breach of fiduciary duty and breach of contract.

While Cadence was certainly free to pursue its own business interests, AmmoCore became "road kill" to Cadence's shifting strategies, personnel and motivations, during a time that Cadence had both fiduciary and contractual duties to AmmoCore, and a time when Cadence was subject to a consent order that was intended to protect interoperability and competition in the routing market.

---

[1] See the factual summary below, all of which facts can be attested to by one or more percipient witnesses and company records

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484.3

When Cadence (including its affiliates) originally invested in AmmoCore, Cadence was involved in a life and death battle with Avant! and was very concerned about Cadence's next generation tool flows. Cadence was also constrained in its ability to buy or invest in routing tools by the FTC consent order. Once Cadence bought SPC, Plato and Simplex, it faced a very different set of opportunities and constraints. While Cadence was certainly free to change its own strategy based on these changed circumstances, it appears to have also deliberately manipulated AmmoCore's strategy and relationship to Cadence to its (and its executives) own interests.

A central element of my conclusion, based on my experience in the EDA industry, is that AmmoCore, by virtue of its OEM agreement with Cadence, was engaged in the "development or sale of a routing tool" under the plain language of the Consent Order. **Cadence has indicated to me in preliminary conversations that their counsel at Gibson Dunn disagrees with this view; I welcome them to furnish an opinion to substantiate that conclusion.**

## III. BACKGROUND – FTC CONSENT ORDER

The 1997 FTC consent order (the "Consent Order") defines "Cadence" to include directors, officers, subsidiaries, groups, affiliates, agents, etc., and imposes three orders to Cadence:

    a. Cadence (as part of its Connections Partner Program) must license its software to companies who need to interface with Cadence's routing tools on equal terms;

    b. Cadence must notify the FTC if it acquires stock or interest in any company, engaged in the development or sale of IC routing tools in the US within a year preceding such acquisition, unless it is solely for investment purposes and Cadence does not hold more than 10% of any class of security;

    c. Cadence must notify the FTC of its intention to acquire the assets previously used (and still suitable for use) in the development or sale of IC routing tools, if the acquisition price exceeds $5 million.

The FTC regularly audits Cadence's Connections Partner program to ensure compliance, and Cadence must file compliance reports with the FTC. Any violation carries a civil fine of $11,000 per day, on a continuing basis from the date that each violation occurred. The FTC consent order expires in August 2007.

## IV. POSSIBLE CLAIMS OF AMMOCORE. AmmoCore's possible claims against Cadence include the following. The factual and legal bases are of course somewhat overlapping.

    1. Antitrust Claims.

A. <u>Manipulation of AmmoCore's Business</u>. The clear intent of the Consent Order was to protect competition and interoperability in the routing and P&R flow marketplace[2]. The overall pattern of Cadence's conduct toward AmmoCore has been to violate both the letter and spirit of the Consent Order. Cadence's involvement in the management of AmmoCore's business appears to represent a violation of the Consent Order and give rise to private antitrust rights for AmmoCore. The bases of these claims include:

   i. Failure to notify the FTC of Cadence's greater than 10% investment in (and effective management control of) AmmoCore, while AmmoCore was engaged in the sale of a router in the U.S.;

   ii. Linking the technical integration and sales strategies of AmmoCore to Cadence's tools and forestalling integration with Cadence competitors;

   iii. The conflicted loyalties of certain AmmoCore board members and the role of certain officers, who were being compensated by Cadence while working for AmmoCore;

   iv. Failure to follow through on Cadence's representations that AmmoCore was to leverage Cadence's sales and distribution channel;

   v. Interference with potential AmmoCore customer opportunities in the US by Cadence and the usurpation of those opportunities to the benefit of Cadence;

   vi. The shaping of AmmoCore's business strategy by Cadence to a "Cadence-centric" flow, to the long-term disadvantage of AmmoCore, and in clear violation of the intent of the Consent Order;

   vii. Failure to comply with the shareholder agreements which contemplated a limited role for Cadence in the management of AmmoCore; and

   viii. The structure of the OEM agreement (which was entered into collusively with Cadence representatives on both sides of the deal), which (a) effectively limited AmmoCore's inter-operability strategy to working with Cadence, (b) set a price minimum for the sale of Cadence's tools, (c) created a tie between Cadence's tools and AmmoCore's and (d) limited the output of AmmoCore's tools.

2. <u>Breach of Fiduciary Duty.</u>

A. <u>Self-dealing in the formation and implementation of the Asset Purchase Agreement between AmmoCore and Cadence.</u> While "fire sale" transactions are never pretty, the terms of the Asset Purchase Agreement are atypically favorable to Cadence. Among the atypical aspects of this transaction:

   i. It appears that Cadence representatives or affiliates (i.e. Jim Hogan and Bruce Bourbon) effectively controlled AmmoCore's side of the negotiations. Gary Larsen,

---

[2] I was directly involved in discussions with the FTC in 1997, and had managed Synopsys' investment in CCT, which precipitated the Consent Order.

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484.3

AmmoCore's then CEO, was excluded from negotiations, as was Tom Katsioulas. It is not clear the degree to which AmmoCore's putative counsel, Warren Lazarow, was either engaged on AmmoCore's behalf or might have been conflicted through other dealings with Cadence.

ii.  The Asset Purchase Agreement permitted (either through its terms or through the failure of the Cadence-affiliated representatives to protect the interests of AmmoCore in its enforcement) Cadence to hire away key engineers through the course of negotiating and then review source code without closing. Since it is universally understood in the EDA industry that access to source code and engineers constitutes effective control of intellectual property, AmmoCore's interests were not protected in the transaction.

iii.  Throughout the history of AmmoCore, Cadence representatives and affiliates shaped the business and technical strategy of AmmoCore to focus AmmoCore's interface and inter-operability on Cadence's routing tools, despite AmmoCore's desire to link with other tools such as Synopsys and Magma.  As a result, AmmoCore's possible value to another EDA purchaser was diminished, and with it its negotiating leverage vis-à-vis this highly one-sided Cadence transaction.

iv.  The Asset Purchase Agreement was precipitated by the Company's running out of cash and lack of alternatives for fund-raising or other buyers.  However, the Company had closed on a first tranche of an insider bridge loan and had been assured by the investors (primarily Cadence and affiliates) that further funding was forthcoming.  AmmoCore's CEO Gary Larsen would have pursued other funding alternatives had he known that he would be in such a dire situation as emerged.

v.  The Asset Purchase Agreement was apparently never signed, yet the Cadence-affiliated management of AmmoCore gave Cadence access to AmmoCore's IP with no apparent protection.  This conduct can only be described as startling, and unimaginable in a true arms-length relationship.

vi.  Overall, it appears the Cadence as a creditor, shareholder, board member and fiduciary did not seek to maximize the value of AmmoCore in the disposition of its assets.


B.  Failure to Properly Manage the Governance of AmmoCore.

Cadence directly and through its affiliates, disregarded the corporate governance requirements of AmmoCore, including voting agreements to which Cadence was a party

i.  Failure to meet regularly;

ii.  Failure to comply with Voting Agreement requirements with respect to election of directors to represent specific classes;

iii.  Deliberate undermining of Mr. Katsioulas' position as a truly independent director; and

    iv. Overlapping and conflicting roles.

3. <u>Breach of Contract.</u>

a. <u>Cadence's failure to follow through with the Asset Purchase Agreement.</u> Notwithstanding the highly favorable terms of the Asset Purchase Agreement, Cadence failed to follow through on its terms.   It appears that the most likely reasons for Cadence's actions were (a) that it had already effectively transferred the AmmoCore IP through the hiring of AmmoCore engineers and access to the source code, (b) that Cadence was seeking to avoid a transaction that would require notice to the FTC under the Consent Order, and (c) that Cadence-affiliated executives were seeking to avoid disclosure of their overlapping interests in AmmoCore and Cadence.

Given that any standard legal test would collapse the interests of RWI and Telos as well as certain individuals such as Jim Hogan as either Cadence "affiliates" or "agents" under the Consent Order, it appears that throughout the last several years Cadence's position acquired interest in AmmoCore exceeded the 10% threshold for notice to the FTC, particularly since during this period AmmoCore was both OEMing Cadence's routing tool and having its interoperability strategy dictated by Cadence's affiliates and agents.

Cadence's motivation for not completing the Asset Purchase Agreement may have been a desire to avoid notification to the FTC which might have (i) alerted the FTC to prior violations of the Consent Order in regard to AmmoCore, (ii) heightened FTC scrutiny of other Cadence transactions (e.g., SPC, Plato, Simplex, Neolinear) that involved routing technology, (iii) impacted pending or future Cadence transactions or (iv) impacted the scheduled expiration of the Consent Order.

Another possible reason for Cadence's failure to follow through with the Asset Purchase Agreement is that the overlapping interests of Cadence executives in AmmoCore had not been previously disclosed under Cadence's Code of Business Conduct, and therefore those executives concluded that completing such a transaction was against their individual interests.

4. <u>Defamation.</u>  Mr. Katsioulas may have claims for defamation against Cadence and its affiliates for damage to Mr. Katsioulas' reputation and harming his ability to start another company or find employment in EDA.

<u>5  Other Claims.</u>  In addition to AmmoCore's claims, there are four areas where Cadence's actions may give rise to claims, but where it is uncertain that AmmoCore itself has standing.
    a.  Failure to properly notify the FTC of Consent Order implications in any of the SPC, Plato or Simplex acquisitions or in the (greater than 10%) investments in AmmoCore.

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484.3

    b.  The pattern of self-dealing (and apparent non-disclosure) in Cadence's investment and M&A activities (including, but not limited to AmmoCore) in the related investment vehicles such as Telos.

    c.  The role of Cadence executives who had earn-outs in conflicting products lines (e.g., SPC) in decision-making with respect to AmmoCore.

    d.  Cadence supplying multiple tool licenses to AmmoCore without standard Connections Partners Agreements on several occasions during the period of early 2000 to late 2002, with terms more favorable compared to other startups.

## V. CADENCE'S EXPLANATIONS—CONFLICTING MOTIVATIONS

Given that Cadence and its affiliated investors lost money as a result of AmmoCore's failure, it is reasonable to ask why Cadence would have deliberately aided that outcome. It appears that Cadence and its affiliated investors and executives may have been motivated by several "Cadence-centric" considerations that outweighed any interest in the success of AmmoCore:

1. A desire to protect the business interests of Cadence, particularly after key Cadence acquisitions, which could have been adversely impacted by AmmoCore's technology and business model;

2. A desire to avoid disclosure of conflicting and apparently undisclosed overlapping interests among both investing entities and individuals affiliated with Cadence and Cadence itself;

3. A desire to prevent the acquisition of AmmoCore technology by a Cadence competitor;

4. A desire to avoid notifications to the FTC or SEC which might have alerted those agencies to the absence of prior required notifications;

5. The interest of Cadence executives who had a direct financial interest in earn-outs (e.g., SPC, Plato) to favor products which were driving their earn-out payments; and

6. A desire to control the timing of an acquisition of AmmoCore and ultimately its IP in relation to Cadence's business strategies and/or the expiration of the FTC order.

## CHRONOLOGY

1.      AmmoCore was founded in September 1999 by Tom Katsioulas, Stan Chow, Jacob Avidan and Dimitri Fotakis. The four founders raised approximately $2.5 million through the sale of convertible promissory notes from 48 individual investors.

2.      AmmoCore developed an Enterprise/IP Platform called Fabrix, a next generation "Netlist-to-GDSII" tool flow and physical design environment (a.k.a. layout environment) that reduced the design turnaround time of complex integrated circuits ("ICs") through the massive deployment of market leading placement and routing ("P&R") tools, enabled by AmmoCore's patented SBlock® architecture and silicon fabric, the core intellectual property ("IP").

3.      AmmoCore did not plan to develop, license or sell P&R tools, but to leverage and complement leading EDA suppliers of P&R tools to develop a unique business model. The technical strategy was to develop an interoperable flow with production-proven P&R tools ("P&R tool flow") being used in conjunction with Fabrix's SuperFlat$^{TM}$ methodology to implement a whole IC ("full-chip") Netlist-to-GDSII process. The product strategy was to leverage the installed base of Cadence and Avant! and offer Fabrix on-top of the existing P&R installations. AmmoCore intended to license both the Fabrix software and the SBlock® architecture IP.

4.      Since Fabrix increased productivity through the wide deployment of P&R tools, it required to interface with a much higher number of tools than other EDA startups. Starting in November 1999 Cadence's Jim Hogan agreed to supply P&R tools to AmmoCore, to be used for technology development. At the time Cadence was involved in a fierce battle with Avant! and Hogan was worried about Magma momentum with its highly integrated P&R tool flow. Initially, Cadence supplied a few P&R licenses through a product loan agreement ("PLA") and temporary license keys, until AmmoCore's application to Connections Partners would be approved.

5.      By February 2000, AmmoCore had solicited NEC-Europe ("NEC-EE") and Fujitsu Microelectronics Inc. ("FMI") as technology development partners. Additional designs were provided by Toshiba-US. All of them were attracted to the simplicity and elegance of the SBlock® invention and the ability preserve the existing P&R tools but continue to buy more licenses, if they needed to increase design capacity and/or reduce turnaround time ("TAT").

6.      In March 2000, Cadence's P&R licenses were about to expire and the Connections Partner application had not been processed. Hogan refused to renew the licenses, insisting on seeing the technology before authorizing a renewal and agreed to sign a special NDA because the SBlock® patents had not been filed yet. Hogan was enthusiastic about the SBlock® idea and wanted to invest in AmmoCore, saying that SBlocks® would commoditize the placement and routing market. At the time, Hogan was worried about the competitiveness of Cadence's routing technology coupled with the fact that Cadence was constrained by the FTC in investing or acquiring routing tool companies.

7.      Cadence's Connections Partners issued a new PLA to AmmoCore for several P&R tools. By July 2000, AmmoCore had received over 25 P&R licenses. AK Kalekos from Telos

-9-

Venture Partners, Lucio Lanza from Lanzatech Ventures and Handel Jones from IBS, were intrigued by the SBlock® IP and the potential to develop multiple and re-occurring revenue streams on a per IC basis, or access the larger design budgets instead of EDA budgets.

8.     By late 2000, AmmoCore had two patents pending and a technology prototype for Fabrix, which promised to be a disruptive technology. AmmoCore received a term sheet from Crescent Ventures for an $18 million pre-money valuation to fund the product development phase. Cadence decided to invest and become a strategic partner of AmmoCore. Telos Venture partners, a Cadence venture subsidiary also decided to invest. Up to this point Cadence had frequently refreshed and increased the supply of P&R licenses to AmmoCore without a CPA.

9.     In January 2001, Cadence issued another PLA to AmmoCore for over 100 P&R licenses for a term of 230 days to accelerate development, in anticipation of investing at AmmoCore. AmmoCore converted the 48 Note holders into Series-A, and raised $13.7 million for the Series-B financing. The investors were Cadence, RWI Group ("RWI"), Telos Venture Partners ("Telos"), Donald L. Lucas and other Cadence-affiliated investors. Additional venture investors were Bay Partners ("Bay") represented by Bob Williams and Crescent Ventures ("Crescent") represented by Kevin Hall.

10.    There where were a number of overlapping interests related to Cadence and its affiliated investors, some of which were not disclosed to AmmoCore:

- Cadence directly owned more than 70% controlling interest in Telos Venture Partners, with Telos' remaining funds being investments of Cadence executives;

- Donald L. Lucas ("DLL") was the chairman of the board of Cadence and Donald A. Lucas ("DAL") was the founding partner of RWI;

- Ray Bingham (Cadence's then-CEO) was an investor at RWI. DLL and Bingham acted as Cadence's investment committee regarding Telos investments;

- Telos' general partners AK Kalekos and Bruce Bourbon reported to DLL and Bingham with respect to the investments of Telos, including AmmoCore;

- Cadence's Sr. VP Jim Hogan was in charge of Cadence's investments, mergers and acquisitions, reporting to Cadence's directors Bingham and DLL;

- Most of the above individuals were individual stockholders of Cadence.

11.    During the Series-B financing the above individuals represented that Telos and RWI were independent venture entities, which were not influenced by Cadence. The Series-B closing documents include no acknowledgement that Cadence, Telos and RWI were affiliated. However, Kalekos and Bourbon had periodic reviews with Bingham and DLL, who influenced Telos' investments.

12.    The Board consisted of two seats representing the Series-B preferred stockholders held by Kevin Hall and Jim Hogan, and two seats representing the common stockholders held by founders Katsioulas and Chow. The voting agreement specified that a fifth Board seat (the

"At-large" seat) was to be filled through the consent of all four directors. AK Kalekos from Telos, DAL from RWI and Williams from Bay Partners were observers at the Board meetings.

13.    Post Series-B and on a fully diluted basis the Company had 22,860,566 shares outstanding, including an option pool of 2,625,000 allocated for the Common. The common stockholders controlled 48.1% and influenced 9% of the preferred stock from the individual Series-A investors (family and friends). From the remaining preferred stock Cadence owned 9.4%, Telos owned 6.2%, RWI 7.8%, and DLL with affiliates 6.1%. Cadence and Telos combined controlled 15.6% of AmmoCore and all Cadence affiliates combined, controlled 29.5% of the company. Cadence, Telos, RWI and DLL owned 18.1%, 12%, 15.1% and 11%, respectively of the Series-B preferred stock.

14.    In March 2001 and during the first board meeting right after the Series-B, Hogan and Kalekos recommended to Katsioulas to pursue a more aggressive operating plan in order to seize the market window for IC designs implemented in 130nm manufacturing process technology by early 2002. At the time, Magma was gaining momentum as a new entrant in the P&R market dominated by Cadence and Avant!. Katsioulas presented the new plan to the Board a month later. From that point and over the next 10 months, Cadence and AmmoCore collaborated in product integration, testing and customer engagements and with Innotech Corporation (Cadence's distributor in Japan). Over 20 Cadence/Innotech employees were involved with AmmoCore in different aspects of the collaboration with Cadence.

15.    In April 2001, Katsioulas proposed to the Board to elect Bill Lattin, a well-known former Intel and Synopsys executive as a candidate for the fifth director. Hogan and Kalekos posed concerns regarding Lattin and the Board did not pursue him. Later, Hogan confided to Katsioulas that DLL did not want to have Lattin on the Board because of his affiliation with Synopsys, Cadence's leading competitor.

16.    In August 2001, Katsioulas, Aronoff, and consultants Mike Loo, Tim Barnes and Bob Leach (a task force approved by the Board), presented to AmmoCore's Board a business model which scaled by increasing the number of P&R tool licenses and through recurring tape-out fees based on AmmoCore's SBlock® IP. Cadence increased the number of P&R licenses which were about to expire. AmmoCore unveiled to the Board the "Scalable Icebox", a custom-made and low cost compute farm based on Sun Microsystems hardware.

17.    In November 2001, upon two prior private requests by DLL to Katsioulas and a motion at a Board meeting by observer DAL, Katsioulas and Chow agreed to elect Telos' partner Kalekos to the Board (in addition to Cadence's Jim Hogan), provided that two more seats be added to maintain the balance as specified in the prior voting agreement. Kalekos was elected to hold the At-large seat and the number of seats was increased to 7 from 5.

18.    Kalekos was appointed to be the head of the CEO search committee and accelerated an ongoing CEO search for AmmoCore conducted by Heidrick & Struggles ("H&S"). Around that time Magma went public, Synopsys acquired Avant! Corporation for approximately $830 million and Cadence acquired Silicon Perspectives ("SPC") for $134 million initial price (with earn-outs that ultimately exceeded $300 million) to strengthen their respective P&R tool flows.

19.     By December 2001, (i) Aronoff and Innotech's Toshi Kaneko had tested the viability of the business model in Japanese accounts, and (ii) Aronoff started discussions with Cisco Systems to license Fabrix to Cisco. Hogan agreed to have Cadence's sales rep for Cisco work jointly with AmmoCore's sales rep on Cisco. As a result of the Cisco engagement, Katsioulas and Aronoff collaborated with Cadence's Robert Callaghan and Hogan to develop and validate the business and licensing model between AmmoCore and Cadence.

20.     Hogan committed on behalf of Cadence to sell jointly with AmmoCore into three major accounts (Hogan referred to this as the "three silver bullets") in order to validate the business model, prior to finalizing a business agreement between Cadence and AmmoCore, to leverage Cadence's sales and distribution channel. Callaghan and Aronoff put in place a sub-licensing agreement to facilitate this interim joint selling arrangement. AmmoCore agreed to develop a mechanism to protect the use of Cadence's tools and Cadence decided to package a capacity-limited version of its P&R tools tailored for SBlocks®.

21.     In early 2002, H&S recommended Jim Kupec as a candidate for the CEO position and Kalekos claimed that the due diligence on Kupec was positive, even though Handel Jones pointed out to Kalekos that Kupec was an unsuitable candidate for AmmoCore, because Kupec lacked domain experience. Certain Board members questioned the large compensation offer for Kupec proposed by H&S. Hogan supported the proposal and the offer was approved.

22.     In January 2002, Katsioulas met with SPC's CEO Ping Chao, to present Fabrix and discuss future integration with SPC's tools. Katsioulas and Munir Ahmed also worked on a plan to support the placement and routing tools of Synopsys/Avant! as the second industry-leading tools after Cadence. Hogan requested Katsioulas to (i) favor the Cadence tools by delaying support of the Synopsys/Avant! tools, and (ii) suggested that Katsioulas evaluate Silicon Valley Research ("SVR") as another alternative, even though SVR had no position in the market (Cadence was paying SVR consulting fees to keep them alive, since SVR had filed a lawsuit to Avant! with Cadence's settlement pending). AmmoCore presented to Kalekos and Hogan a review regarding the maturity status of Fabrix and operating capacity limits.

23.     In February 2002, Cadence acquired for $55 million Plato Corporation ("Plato"), which developed and sold a routing tool in the US. Shortly before Kupec started as CEO of AmmoCore, Katsioulas sent a memo to Hogan outlining certain opportunities and risks related to AmmoCore's core competencies and Cadence's recent acquisitions of SPC and Plato. Up to this point Cadence supplied frequently to AmmoCore licenses of its older generation P&R tools on a PLA basis and without a CPA. Hogan claimed that this was required because Cadence's Connections Partners was being audited by the FTC frequently and agreed that AmmoCore would receive the newer generation tools from SPC and Plato after the joint sales and licensing model were validated and the acquisitions were completed by Cadence.

24.     In the February 2002 Board meeting, Katsioulas resigned as the President and CEO to be replaced by Kupec. Katsioulas became VP of Marketing, while he remained to be director representing the common stockholders. Stan Chow resigned from the Board, surrendering his common seat to Kupec and the prior agreement to maintain the balance for the common was not observed. As a result, 2 out of 7 Board seats remained vacant. Kalekos

pressed for AmmoCore to hire a "dealmaker" and Hogan suggested Salah Werfelli, a Cadence executive.

25.    In March 2002, AmmoCore closed a sale to NEC-EE, validating the business model, consisting of a software license and a tape-out fee based on SBlock® IP. The Company finalized a distribution agreement with Innotech and was about to close two more deals with Cisco and Toshiba U.S. AmmoCore had started to develop a mechanism to protect the use of Cadence's P&R tools and Katsioulas requested to stop the SVR evaluation, because Ahmed had developed a plan to support the Synopsys tools. However, R&D continued to evaluate the SVR tool without Katsioulas' knowledge based on Kupec's direction. Kupec made an offer to Werfelli without any due diligence, claiming that the Board approved him. Katsioulas resigned from the company and the Board.

26.    In April 2002, Kalekos denied Fotakis' request that one of the founders assume Katsioulas' seat to represent common shareholders, which would have been in line with the voting agreement. As a result, none of the founders were present on the Board. Werfelli started in mid April as the VP of marketing and sales and was also appointed as an officer. Board records reflect that AmmoCore deployed Fabrix to NEC-EE, had multiple sales engagements with US accounts, phased out the evaluation of the SVR routing tool and started to evaluate another unproven routing tool from PulseIC. Hogan had not yet honored his promise of supplying the newer tools from SPC and Plato.

27.    Starting in May 2002, and based on Werfelli's approach, AmmoCore changed its strategy away from the Fabrix Enterprise/IP business model. Werfelli began to position Fabrix as an EDA tool being sold purely on a license basis rather than its IP business model, often competing with Cadence and at a substantially higher price. Werfelli quoted to Cisco an annual EDA license fee of $1.5 million, while SPC and Plato combined were selling for less than $500,000. Cisco decided to buy Cadence's tools and not Fabrix.

28.    Werfelli presented in the May 2002 Board meeting a $69 million bookings pipeline of which $8 million was projected for 2002. Werfelli also presented a plan to replace Innotech with SC High Tech as the new distributor in Japan, a month after the distribution agreement with Innotech had been finalized and was about to be signed. Cadence's Callahan participated in that board meeting and five days later, a company record indicates some sort of a "product change initiated as OEM license" to satisfy Cadence's needs.

29.    Cadence acquired Simplex for $350 million; Simplex had developed a routing tool, which was publicly positioned as the X Architecture, because it connected the components inside an IC with diagonal routing. Upon Bingham's approval, Hogan hired Katsioulas as a consultant to Cadence working in Hogan's second home, intending to fund a project in connection with AmmoCore.

30.    By June 2002, AmmoCore had not reduced the burn rate as had been discussed by the board post 9/11, and instead it increased headcount and launched a major campaign in Japan. Werfelli de-emphasized AmmoCore's focus in US accounts (Cisco, Toshiba, Ciena, BroadCom, BanderaCom and others) and focused in Japan. AmmoCore signed a distribution agreement with SC High Tech replacing Innotech, (Cadence acquired Innotech a year later),

which was a key distribution channel for AmmoCore as part of the joint selling with Cadence. According to Matthias Voigt of NEC-EE, AmmoCore stopped pursuing the agreed milestones as part of the licensing agreement that were tied to revenues.

31.     In July 2002, during the highly publicized product launch of AmmoCore, Kupec declared that AmmoCore was competing with Magma and Synopsys. Reports from Magma's and Synopsys suggested that the Japanese prospects were excited about Fabrix's SuperFlat™ methodology and stalled. Synopsys announced its own Virtual Flat methodology shortly thereafter. Reports from AmmoCore's engineering indicated that Werfelli brought several design evaluations from Japan, well beyond the documented capacity, reported to Hogan and Kalekos in January. While AmmoCore was being positioned as competing with P&R tools, Werfelli's administrator employed by Cadence was searching Werfelli's private records at AmmoCore. Katsioulas sent an email to Hogan being concerned about the public positioning of AmmoCore. Hogan resigned from AmmoCore's Board in late July of 2002 and from Cadence a month later. Around the same time Hall stopped attending the Board meetings.

32.     In August 2002, Kupec asked Aronoff to start the legal work for an OEM agreement with Cadence. Board minutes reflect that the Board consisted only of Kalekos (the At-large designee) and Kupec (the Common designee). Kalekos claimed to Katsioulas that the public market positioning of Fabrix and AmmoCore were fine. Upon Bingham's recommendation the Company hired Jim Lindstrom, another Cadence former executive and AmmoCore's CFO. Werfelli and Lindstrom were being paid by Cadence, while being employees of AmmoCore. Cadence, submitted a proposal to AmmoCore for a Software OEM License Agreement ("OEM"), pursuant to which AmmoCore was to sell Cadence's older generation P&R tools as part of Fabrix and pay a fixed price of $250,000 to Cadence, for each license sold.

33.     From September to October 2002, Werfelli was gone in Japan "closing business," according to Kupec. Aronoff questioned whether Werfelli was spending 100% of his time working on AmmoCore business, but Kupec refused to answer his question. According to Ahmed, Werfelli was not attending customer meetings in Japan. Aronoff recalls that Cadence P&R tool licenses used for development expired and that Cadence did not extend them but kept renewing the licenses on short term keys, while the OEM negotiations were ongoing. Kupec told potential venture investors that AmmoCore planned to develop routing tool. AmmoCore was also in discussions with SVR, PulseIC and VIASIC to link with their routing tools through this period.

34.     In late September 2002, Kupec represented to the Board that there were $4.4 million in bookings from Fujitsu and $5.2 million from other bookings, with cash payments being received between Q3 and Q4 of 2002. In the same meeting Kupec presented to the Board an analysis for AmmoCore developing its own routing tool or licensing other routing tools from PulseIC, ViASIC, Synopsys, Magma, Monterey, etc. Kupec also discussed the proposed terms of an OEM agreement for licensing Cadence's older generation P&R tools and met with Bingham to negotiate a lower royalty fee to Cadence as part the OEM agreement. Cadence settled the pending lawsuit with Synopsys/Avant! for $265 million and announced a next generation tool flow ("Encounter") integrating tools from SPC, Plato and Simplex.

35.     In late September, Aronoff requested from Cadence's Michele Cortoy to renew the P&R licenses used for development. Cortoy claimed that AmmoCore needed to execute an OEM agreement first, because under the FTC Consent Order, that was the only way for Cadence to supply P&R tools to AmmoCore with favorable terms, under a Specific Purpose License and Maintenance Agreement ("SPLMA"). This requirement had not been imposed before during Fabrix development and prior to starting the sales engagements of Fabrix.

36.     On October 14th 2002, Kupec executed a Software OEM License Agreement ("OEM") pursuant to which AmmoCore was to sell a special package (called "PIE") of Cadence's older generation P&R tools as part of Fabrix and pay to Cadence the greater of 20% royalty of AmmoCore's product revenues, or $200,000 for each license of PIE sold as part of Fabrix. The OEM agreement restricted the maximum supply of P&R tools to a bundle of 20 and did not include Cadence's top-level routing tool, which was necessary for Fabrix to be complete solution. As a result, the sale of Fabrix was implicitly tied to the sale of Cadence's top level routing tool for prospects using Synopsys and Magma tools, since Fabrix supported a Cadence-centric flow.

37.     On October 17th 2002, Michael Williams (Cadence's VP and associate general counsel) signed two separate agreements with AmmoCore: (i) the OEM agreement and (ii) a Specific Purpose License and Maintenance Agreement ("SPLMA"), pursuant to which AmmoCore was to receive over 300 of Cadence's older generation P&R tools in different configurations, to be used for development. On October 21st Kupec signed the SPLMA and then Cadence supplied the licenses. Cadence and AmmoCore entered into a standard CPA for additional P&R licenses plus analysis tools peripheral to the P&R tool flow. These changes followed both Katsioulas' departure from AmmoCore's board and the relevant Cadence and Synopsys acquisitions described elsewhere.

38.     In early November 2002, Fabrix (using Cadence's older generation placement and routing tools) exceeded the performance of Cadence's new Encounter flow (using the newer tools from SPC, Plato and Simplex) at Toshiba-US. However, "AmmoCore's sales was not interested in selling Fabrix" according to Hideki Yamada, a Toshiba-US manager.

39.     In late November 2002, AmmoCore raised approximately $8 million for the Series-C financing at a $32 million post-money valuation. AmmoCore solicited Sumitomo bank and their U.S. subsidiary Presidio, which invested $2 million each. All the investors from Series-B participated on pro rata basis but Cadence chose not participate at all, however Cadence's affiliates (Telos, RWI, DLL and others), acquired more than 10% interest in Series-C stock. Bay Partners increased his position by investing $1.4 million above pro rata. Post Series-C, Cadence and Telos combined owned 12.1% of AmmoCore. Cadence, Telos, RWI, DLL and affiliates combined controlled 24.4% of the Company, Bay Partners 9.4% and Sumitomo with Presidio 10.3%.

40.     As part of the financing, there were changes in AmmoCore's Board and it appears that prior voting agreements were not observed. Kevin Hall resigned. Williams was elected to be a director representing the Series-C investors and Glen Antle was elected to be an At-large director. Kalekos remained on the Board but it is not clear whether Kalekos continued to hold

-15-

the At-large seat or whether he became the Series-B designee. Katsioulas' seat and another At-large seat remained vacant. Sumitomo and Presidio had a right to be observers, but did not participate in any Board meetings.

41.    In early December 2002 (after the closing of Series-C and a few months after presenting to the Board the expected cash payments from Fujitsu), Kupec and Werfelli reported to the Board that AmmoCore would not meet its forecast because "Fabrix did not work". However, when the founders confronted Werfelli about Toshiba-US, Werfelli claimed that he was "working on bigger deals in Japan and that Toshiba-US was peanuts".

42.    In January 2003, (upon Hogan's recommendation) Katsioulas sent a letter to AmmoCore's Board raising questions about the high burn rate and the changes in market positioning and the new strategy, urging the Board to restore the original strategy. Katsioulas' attorney Eric Kastner questioned AmmoCore's corporate counsel Warren Lazarow about the role of former Cadence executives, their dual compensation and other potential irregularities. However, no satisfactory responses were given to any of the above questions.

43.    Shortly after Katsioulas' letter, Kupec trimmed the head count. Aronoff, Ahmed and Stahel were among the employees who were laid off that had prior knowledge and experience with the Fabrix business model. Kupec replied to Katsioulas' letter but he did not provide any satisfactory answers and misrepresented certain facts. Katsioulas replied to Kupec, clarifying such facts and asked more questions, which caused several discussions between the founders, the Board and the investors. Williams engaged in an extensive discovery and Kalekos warned Katsioulas. Hogan (who was involved in discussions with the Board, DLL and Bingham), recommended Gary Larsen as a new CEO candidate. An email suggests that certain AmmoCore's HR records were destroyed.

44.    In March 2003, Gary Larsen replaced Kupec as the CEO and member of the Board representing the common stockholders. Kalekos resigned and Bruce Bourbon (the other Telos partner) assumed Kalekos' seat. Board. Bill Baumel (the other RWI partner) replaced DAL as an observer. Cadence transferred its stock to Cadence Ireland Ltd, a Cadence subsidiary. According to Hogan the investors started discussions to re-value the company for investment and stock option purposes, claiming that Kupec had deceived the investors by setting false expectations regarding the revenue forecast, which resulted in a "high valuation in Series-C". Larsen indicated to Katsioulas and Fotakis that he was planning to reduce the headcount by 20-30%, including Werfelli and asked Katsioulas what it would take to support the Synopsys/Avant! tools.

45.    In May 2003, Hogan was elected to be an AmmoCore director, filling Katsioulas' vacant seat representing the common stockholders. The company maintained a high burn rate and did not downsize, or lay-off Werfelli, despite Larsen's prior intent to do so. According to Larsen, Hogan recommended not to lay off Werfelli and asked Larsen to increase Werfelli's salary. In June 2002, and based on Hogan's input, Larsen retained Katsioulas as a consultant by AmmoCore to assist with product strategy. During this engagement, Katsioulas informed Larsen and Jose Torres (the new VP of Engineering) about AmmoCore's prior operating issues

and educated Larsen and Larry Yamada (the new VP of Marketing) about AmmoCore's original business model and complementary market positioning.

46.    In August 2003 AmmoCore closed a $3.6 million three-year contract with Fujitsu, for a net of $2.7 million after commissions to SC High Tech (not including any royalties owed to Cadence as a result of the OEM). While AmmoCore had engaged in the sale of Fabrix in the U.S. during 2003, it evaluated routing tools from Silicon Design Systems and Monterey, but did not license any of them. AmmoCore did not support Synopsys tools, despite Larsen's prior intent to do so. Instead, Cadence amended the OEM agreement with AmmoCore to resell only Cadence's older generation routing tool, since AmmoCore had developed a placement tool.

47.    In October 2003, Cadence and AmmoCore renewed the OEM agreement and the SPLMA for another year and Cadence supplied keys for P&R tools a month later. Werfelli failed to achieve his revenue forecast and AmmoCore raised $7 million pursuant to its Series D financing, in an insider round at a $25 million post-money valuation and significant anti-dilution provisions favoring the preferred investors. The Series-D documents also reflect that the Board had retroactively approved for Werfelli and Lindstrom (both officers of AmmoCore) to consult for Cadence, (even though they were paid by Cadence before the Series-C financing). All the investors participated on a pro rata basis, including Cadence.

48.    Cadence and its affiliates acquired more than 10% of AmmoCore's Series-D stock. Post Series-D, Cadence and Telos combined controlled 15.5%, and the Cadence-affiliated parties controlled 32.8% of AmmoCore (with a major portion of the common stock option pool not being utilized). A number of key engineers including Fotakis became disenchanted with the lack of sales performance or the dilution of the common stock and resigned. The founders' control had been reduced to 10% post Series-D, from 26.2% post Series-B.

49.    The terms of the financing were proposed by Bill Baumel of RWI, who was elected to be a director. The Series-D voting agreement reflects that the number of common seats was reduced to 1 from 2 and that the investors agreed among themselves that the Series-B, Series-C and Series-D preferred stock designees were Telos, Bay Partners and RWI respectively. Larsen held the only common seat left, so Hogan presumably assumed the other At-Large seat.

50.    In December 2003, Larry Yamada (AmmoCore's VP of Asian sales) presented to the Board an analysis on the competitive threats to Cadence and the value of a combined Cadence/AmmoCore flow. Yamada revealed to Katsioulas the terms of the OEM agreement and indicated that Magma and Synopsys customers interested in Fabrix were reluctant to purchase Fabrix because of the tight link to Cadence.

51.    In early 2004, Hogan joined Telos as a general partner, but remained on the Board of AmmoCore, claiming that since he was a common stockholder his interests were allied with the common stock, even though Hogan and Bourbon reported to DLL, who was in charge of Cadence's investment committee for Telos. AmmoCore trimmed the workforce including Werfelli and hired another former Cadence executive as the VP of US sales, Steve Flannery. Hogan asked Larsen to retain Fotakis as a consultant to AmmoCore, to evaluate Katsioulas' project in connection with AmmoCore.

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484 3

52.     In February 2004, Fabrix was proven in production at Fujitsu with working silicon for a complex IC design. Hogan claimed that Fabrix was not proven with "high-end" designs, which was needed for Cadence to consider acquiring AmmoCore. A month later, Bourbon retained Katsioulas as a consultant at Telos to help with the business plans of potential startup investments in anticipation of funding the project in connection with AmmoCore. Cadence announced the acquisition of Neolinear for approximately $90 million. Cadence and RWI were investors in Neolinear, which had an OEM with Cadence and sold a routing tool as part of its tool flow targeted for the analog IC market.

53.     In May 2004, Katsioulas' project in connection with AmmoCore did not materialize and Fotakis founded Athena Design Systems ("Athena") to develop a platform that reduced the turnaround time of physical design tasks through the massive deployment of point tools in the open network. Hogan claimed to Katsioulas that he would get involved with Athena later and showed Katsioulas an email indicating that Cadence did not intend to supply routing tools to Athena for development. Cadence appointed Mike Fister as the CEO and Fister joined the advisory board of RWI. Bingham became the executive chairman and DLL stepped down to a director. Hogan and Lazarou claimed that Cadence was about to acquire AmmoCore.

54.     By June 2004, AmmoCore had gained momentum in several major U.S. accounts: ATI, LSI Logic, BroadCom (where Fabrix beat Magma on a small "high-end" design), S3, and Freescale. In Japan, AmmoCore beat Cadence and Synopsys at Renesas (but lost the business to Synopsys, which a closed a corporate deal with Renesas), closed a $1.2M booking with a NEC-NIMS and was about to close a $2.5M repeat sale to Fujitsu. A junior engineer at Fujitsu completed a complex IC design using Fabrix in a few weeks while a larger design team using Cadence's next generation Encounter flow was unable to finish the same design.

55.     In July 2004, there was a delay with the Fujitsu sale. Hogan went to Japan on behalf of AmmoCore to negotiate the closing of the expected sale but came back empty handed. Cadence closed a $250 million deal with Fujitsu and the $2.5 million budget reserved for AmmoCore went to Cadence's corporate deal (according to Larry Yamada, AmmoCore's VP of Asian Sales), costing revenues which were vital for AmmoCore's survival. Hogan claimed that SC High Tech was responsible for the failure at Fujitsu. Lindstrom was let go in August 2004 and the company retained Larry Sferra as a part-time CFO.

56.     In September 2004, AmmoCore ran out of cash and was forced to reduce headcount significantly. The investors agreed to fund the Company based on a note and warrant investment in two tranches (the "bridge loan") negotiated by RWI and affiliated parties, all of which committed to participate. Sumitomo and Presidio followed after Cadence agreed to join, but Bay Partners waited, according to Board minutes. RWI was assigned as the collateral agent in the event of a default on the loan. Cadence invested its pro rata and factored in an additional $400,000 in royalties owed by AmmoCore, as a result of the OEM agreement and prior sales.

57.     In October 2004, and while AmmoCore had closed a $1.2 million booking with an NEC-NIMS in Japan, Cadence cut-off support its routing tool to AmmoCore, while $700,000 of expected revenues were contingent upon AmmoCore's success at NEC-NIMS. According to Larry Yamada, Cadence kept stalling after Yamada requested an official support channel.

This occurred around the time that the bridge loan was being negotiated with Cadence. During the same month the SPLMA for supplying routing tools to AmmoCore expired. Cadence did not renew the agreement and continued to supply tools to AmmoCore.

58.      In October 2004, AmmoCore held the first closing of the first tranche for $2.5M which would provide operating funds until January 2005. Cadence and affiliates acquired 64% interest in the Notes of the bridge loan. The closing documents of the bridge loan state that AmmoCore made serious attempts to solicit outside funding, but Larsen claimed that the Company approached only two VCs. One of the VCs was interested to invest, but Telos was not interested to work with them, Larsen said.

59.      By November 2004 the Company had raised $2.9 million for the first tranche of the bridge loan. Several preferred stockholders who decided not to participate in the bridge loan including Bay Partners, had their stock converted to common. As a result, the founders lost control of the common vote and key company decisions, such as acquisition or liquidation. In December 2004, Williams resigned from the Board. Hogan claimed to Katsioulas that the second tranche of the bridge loan would close in January 2005.

60.      In early January 2005, Hogan assured Larsen that the second tranche of the bridge loan had been secured, according to Larsen. Around the same time Renlin Chang told Aronoff in Japan that he was very upbeat about NEC-NMS' intention to use Fabrix in production. A week later, Bourbon informed Larsen that the investors were no longer willing to fund AmmoCore, according to Larsen. Hogan claimed that while he was on vacation DLL talked to Bourbon and Baumel suggesting that it may not be wise to invest good money after bad.

61.      According to an affidavit by Lisa Fontenot by Gibson Dunn representing Cadence, "the holders of a majority of the outstanding principal amount of the Notes", informed the Company that they would not fund the second tranche of the bridge loan. Excluding Sumitomo and the small creditors, Cadence and affiliated parties held 64% of the outstanding notes.

62.      AmmoCore's precarious situation leaked to the press in January 18, 2005. According to Larsen, when the 'air supply' was cut-off, there was no time to react and properly position AmmoCore for acquisition, and the negotiating leverage was diminished. Hogan and Bourbon handled the negotiations with Cadence by themselves and did not include Larsen. In addition, Hogan denied Katsioulas' offer to assist in explaining the value of AmmoCore to Cadence. Lazarow was aware of the above facts and conflicts.

63.      According to founder Jacob Avidan, AmmoCore's staff presented the Company and the technology to several EDA companies. Avidan claims that Synopsys' Paul Lo, was wondering why AmmoCore had not attempted to raise any funding, given its impressive results and customer pipeline. Cadence's Wei-Jin Dai approached Avidan to recruit him at Cadence. Avidan confronted Hogan and Bourbon who claimed that nobody was interested to invest and asked Avidan to arrange for a presentation to Dai. However, Dai did not respond to Avidan and there was no Fabrix presentation given to Dai, Avidan said. Meanwhile Cadence solicited AmmoCore' key engineers and hired a number of them.

64.      A number of small companies expressed an interest in AmmoCore's assets. Athena, which had just hired John Murphy (Bingham's former chief of staff) as the new CEO offered

-19-

to acquire the assets for stock. However, Hogan did not follow up on the offer, Fotakis said. Cadence purported to offer $2 million for AmmoCore's assets and the Board started discussions in February 2005 with Tom Romero to appoint him as the liquidating agent. AmmoCore cleaned up all the paper records from the offices and did not back up any sales and marketing electronic records, according to Tom Gee, AmmoCore's IT director. Hogan held all customer contracts (including the OEM) in his office at Telos, according to Tom Romero and told Katsioulas to stay away from Aronoff, who asked Jennifer Anderson about the OEM.

65.     In April 2005, when AmmoCore's Board approved AmmoCore's asset sale to Cadence for $2 million, three out of five of AmmoCore's directors (Hogan, Bourbon and Baumel) were investors and creditors affiliated with Cadence. A month later AmmoCore's stockholders consented to the attempted asset sale. Even though 3 out the 4 founders did not consent, a majority of the common stockholders approved the asset sale, through the swing vote of Bay Partners.

66.     In June 2005, AmmoCore finalized all the legal work for the closing of the asset sale. AmmoCore assigned its patents and trade secrets to Cadence and transferred its source code to Cadence via web server. The closing was to have completed through Cadence's confirmation of the receipt of the source code. However, there was a delay in the final closing, because Cadence attempted to install and verify the software, even though the terms on the asset purchase agreement were atypically favorable to Cadence .and there is no provision on termination for convenience and no warranty for the acquired IP

67.     In early August 2005, (shortly after Bingham resigned from Cadence and over a month after Cadence's receipt of AmmoCore's IP), Cadence withdrew from the transaction, claiming that Cadence could not verify or could not make the code work. The Board did not dissolve AmmoCore as approved by the stockholders. Instead, Hogan approached Fotakis and Katsioulas separately, purporting to maximize the value of the IP. Several proposals were submitted to Baumel, but Bourbon and Baumel were not interested, according to Hogan. AmmoCore's assets were retuned and Lazarow, who became the custodian and a number of AmmoCore's patents pending were lost as Baumel refused to pay for filing fees.

68.     In April 2006, the Chancery Court judge suggested that Katsioulas and Cadence should agree to have stockholders meeting within 30-45 days. Even though Cadence had an opportunity to resolve the contested matter with Katsioulas, Cadence and affiliated insider investors purporting to be AmmoCore's creditors (the "Petitioning Creditors"), filed an involuntary petition for Chapter 7 in the Delaware Bankruptcy Court. An interim trustee was appointed and the annual stockholders meeting ended up being delayed.

69.     In May 2006, Cadence's attorneys admitted the Chapter 7 proceedings did not affect AmmoCore's corporate governance. Katsioulas obtained a court-order from the Delaware Chancery Court, authorizing Katsioulas to convene an annual stockholder meeting, which was held on August 4, 2006. The Petitioning Creditors were present by proxy of Lisa Fontenot, (which increased the number of shares for quorum), but did not propose any candidates and withheld their vote. Katsioulas and Aronoff were duly elected directors.

62231-0001/LEGAL12262484.1
62231-0001/LEGAL12262484.3